IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| YOLANDA GARCIA, | CASE NO. 1:22-cv-1044 |
| Plaintiff, | DISTRICT JUDGE |
| vs. | DONALD C. NUGENT |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE |
| Defendant. | JAMES E. GRIMES JR. |
| | **REPORT & RECOMMENDATION** |

Plaintiff Yolanda Garcia filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In August 2017, Garcia filed an application for Disability Insurance Benefits alleging a disability onset date of January 1, 2014,[1] and claiming she was disabled due to herniated discs. Tr. 282. The Social Security

---

[1]     "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

Administration denied Garcia's application.[2] Tr. 81. Garcia then requested a hearing before an Administrative Law Judge (ALJ). Tr. 97.

In May 2021, an ALJ held a hearing.[3] Garcia and a vocational expert testified. Tr. 34–63. Later that month, the ALJ issued a written decision finding that Garcia was not disabled. Tr. 19–28. The ALJ's decision became final on April 19, 2022, when the Social Security Appeals Council declined further review. Tr. 1-3; *see* 20 C.F.R. § 404.981.

Garcia filed this action on June 16, 2022. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ committed harmful error at Step Four of the Sequential Evaluation when she failed to find that the effect of the combination of Garcia's symptoms precluded her from the ability to perform her past relevant work at the light level of exertion on a full-time and sustained basis.

> 2. The ALJ erred in her credibility finding when she failed to include the limitations stated by Garcia in her RFC.

Doc. 7, at 1.

---

[2]     According to the Commissioner, under "procedures being tested as part of a disability redesign prototype, [Garcia's] claim was not subject to the reconsideration step of the administrative review process." Doc. 9, at 2 n.1. (citing 20 C.F.R. §§ 404.900, 404.906(b)(4)).

[3]     The ALJ first held a hearing in February 2020, but Garcia appeared without counsel and expressed her desire to obtain counsel. So the ALJ continued the hearing until Garcia obtained counsel. Tr. 64–73.

**Evidence**

*1.    Personal and vocational evidence*

Garcia was born in 1956 and was 62 years old in June 2019, her date last insured.[4] Tr. 24. She completed twelfth grade and used to work as a file clerk at a hospital. Tr. 43, 52–53, 283.

*2.    Medical evidence[5]*

In September 2015, Garcia had an MRI of her lumbar spine. The MRI showed moderate central canal stenosis at L2-3 related to a broad-based central disc herniation and posterior element hypertrophy; mild canal stenosis at L1-2; right paracentral disc herniation superimposed upon a concentric disc bulge at L3-4; disc bulges at L4-5 and L5-S1; and a right extraforaminal disc herniation at L5-S1 abutting the exiting right L5 nerve root.[6] Tr. 376–77.

---

[4]    To be entitled to Disability Insurance Benefits, claimants must be wage-earners who accumulated sufficient earning credits and became disabled before the end of their insured date. *See, e.g.*, 42 U.S.C. § 423(c)(1); 20 C.F.R. § 404.101; *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Soc. Sec. Disability Claims Prac. & Proc.* § 5:3 (2nd ed.).

[5]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

[6]    Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has 7 vertebrae designated as C1 through C7. *See* https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column (last visited Jan. 26, 2023). The 12 vertebrae comprising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id.* The 5 in the lower spine—the lumbar spine—are L1 through L5. Id. And the 5 vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region (last visited Jan. 26, 2023).

Later that month, Garcia started physical therapy for lower back pain. Tr. 382. She reported that her back pain radiated intermittently to her legs, with her left being worse than right. Tr. 382. She had physical therapy in the past for lower back pain and therapy helped. Tr. 382. Garcia reported "decreased functional ability" and said that her pain was exacerbated by prolonged standing and walking, "trunk bending activities," and carrying, lifting, pushing, and pulling. Tr. 382–83. She also reported increased pain when doing household chores, "getting up after prolonged sitting and lying position[s]," and changing positions lying in bed. Tr. 383.

In January 2016, Garcia saw Benjamin Kropsky, M.D., for a consultative exam. Tr. 398–402. Garcia reported low back pain that radiated to both legs and numbness in her right leg. Tr. 398. She rated her pain on most days as an 8 out of 10. Tr. 398. She performed light cleaning once a week, cooked one to three times a week, and showered, bathed, and dressed herself daily. Tr. 399. She watched television, read, and went to church. Tr. 399. She took Tramadol for pain and Cyclobenzaprine, a muscle relaxant. Tr. 398. Dr. Kropsky's exam findings showed that Garcia had full strength in her arms and legs, full grip strength in both hands, and full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles. Tr. 400. She had no tenderness or swelling in her joints and normal sensation. Tr. 400. She had a mild limp favoring her right leg and difficulty walking on her heels. Tr. 399. She did not need help changing for the exam or "getting on and off" the exam

table but "needed some help getting up from a supine position on the exam table." Tr. 399. She was able to rise from her chair with mild difficulty. Tr. 399. Dr. Kropsky reviewed an x-ray of Garcia's lumbosacral spine and wrote, "degenerative changes." Tr. 400. He diagnosed Garcia with lumbar radiculopathy secondary to lumbar disc disease. Tr. 401. Dr. Kropsky opined that due to lower back pain, Garcia had moderate limitations lifting and carrying and mild to moderate limitations with prolonged walking and climbing stairs. Tr. 401. He wrote that Garcia needed some help with household chores. Tr. 401.

Garcia attended physical therapy from February to June 2016. Tr. 405–51. She briefly returned for 2 additional sessions in September 2016. Tr. 452–55.

In January 2017, Garcia had an initial evaluation for physical therapy and reported an exacerbation of pain after prolonged standing. Tr. 460. She attended sessions through April. Tr. 460–516.

Garcia also went to pain management for radiating lower back pain. In 2017, Garcia had lumbar trigger point injections—in March, Tr. 569, June, Tr. 566, July, Tr. 563, August, Tr. 560, and September, Tr. 557.

In September 2017, Garcia saw Olga Yevsikova, M.D., for an orthopedic exam. Tr. 519. Garcia reported having lower back pain for 30 years. Tr. 519. Five months before the exam, her pain started to radiate to her legs and feet. Tr. 519. The pain was sharp, continuous, and occurred every day. Tr. 519.

Sometimes her pain level reached a 10 out of 10 in severity. Tr. 519. Garcia took Gabapentin, Tramadol, Tylenol, and Ibuprofen. Tr. 519. She also received back injections, which helped "for some period of time." Tr. 520. She did not perform housecleaning tasks and sometimes needed help showering and dressing. Tr. 520. Her activities consisted of watching television. Tr. 519.

Dr. Yevsikova's exam findings showed that Garcia had full grip strength and intact dexterity. Tr. 520. In her cervical spine, Garcia had full flexion, extension, and rotary movements without pain. Tr. 520. She had good shoulder movement, no joint inflammation or instability, and full strength in her proximal and distal muscles. Tr. 521. She had reduced range of motion in her lumbar spine and "poor effort" with lumbar flexion to 40 degrees. Tr. 521. She had no spinal or paraspinal tenderness; no sacroiliac joint or sciatic notch tenderness; no spasm, scoliosis, or trigger points; and her straight leg raising test was negative.[7] Tr. 521. Garcia was not using an assistive device, her gait was normal, and she was able to take a few steps on both heels and toes. Tr. 520. She had full muscle strength in her leg muscles, no muscle atrophy, and decreased sensation in her left leg with no inflammation or instability. Tr. 521.

Dr. Yevsikova diagnosed Garcia with lower back pain, leg pain, and bronchial asthma. Tr. 521. Dr. Yevsikova opined that Garcia had moderate

---

[7]     In a straight leg-raising test, the patient lies down, fully extends the knee, and lifts the leg. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1900. Leg pain when raising the leg 30–90 degrees is a positive test and indicates lumbar radiculopathy. *Id.*

limitations with heavy lifting, heavy carrying, pulling, pushing, bending, squatting, kneeling, and climbing stairs. Tr. 521 She had mild limitations performing overhead activity with both arms. Tr. 522. She had mild to moderate limitations with prolonged walking, prolonged standing, and prolonged sitting. Tr. 521–22. Garcia should avoid unprotected heights and any activity that could put her at risk of falls. Tr. 522. She should avoid smoke, dust, and known respiratory irritants. Tr. 522.

In October 2017, Garcia went to the pain management office and reported lower back pain radiating to her legs. Tr. 525. Upon exam, Garcia had a decreased range of motion in her lumbar spine, significant spasm, and tenderness to palpation over her lumbar paraspinal region. Tr. 527. She had diminished sensation on the L4-5 and L5-S1 dermatomal distribution. Tr. 527. Garcia reported that physical therapy was "moderately helpful," but she had no remaining therapy insurance benefits for the year. Tr. 525. The provider assessed Garcia with lumber radiculopathy, "other intervertebral disc disorders, lumbar region," and lumbar disc displacement. Tr. 525. Garcia received a trigger point injection in her lumbar region. Tr. 525. Two days later, Garcia had a lumbar epidural steroid injection. Tr. 523–24.

Garcia had trigger point injections in her lumbar area in early 2018—in January, Tr. 549, February, Tr. 545, and March, Tr. 542.

In May 2018, Garcia had a pain management appointment for radiating lower back pain. Tr. 536. Garcia described her back pain as aching, sharp,

7

shooting, and throbbing. Tr. 536. Her pain radiated to her buttock and hip area and legs. Tr. 536. She also had numbness and tingling. Tr. 536. Upon exam, Garcia had a decreased lumbar range of motion in all planes, particularly with extension; significant spasm; taut muscle bands; and tenderness to palpation. Tr. 537. She had diminished sensation on the L4-5 and L5-S1 dermatomal distribution. Tr. 537. Garcia received a trigger point injection in her lumbar region. Tr. 538.

In June 2018, Garcia had a pain management visit and reported that her lower back pain radiated more to her left leg. Tr. 532. She received a trigger point injection. Tr. 532.

In April 2019, Garcia had a lumbar MRI. Tr. 595. The MRI showed a mild disc bulge at L1-2 and L3-4. Tr. 595. Garcia had a "moderate broadbase disc protrusion with moderate ligamentum flavum hypertrophy causing mild central narrowing and moderate left later recess narrowing" at L2-3 and moderate facet arthropathy with moderate disc bulge and mild right lateral recess narrowing at L4-5. Tr. 595. She had degenerative facet arthropathy and a degenerative disc bulge with minimal endplate spurring at L5-S1. Tr. 595. The impression was moderate lumbar spondylosis. Tr. 595.

In August 2020, a year after Garcia's insured status expired, Garcia had a telemedicine visit at pain management for a follow-up for left shoulder pain. Tr. 635. She had finished 2 months of physical therapy, rated her shoulder pain as 6 out of 10, and said that it felt much better. Tr. 636. She also said her lower

back was feeling better. Tr. 636. A left shoulder x-ray showed mild joint osteoarthritis. Tr. 636.

### 3. *State agency opinions*[8]

In October 2017, state agency analyst S. Hill reviewed Garcia's record and assessed Garcia's physical residual functional capacity (RFC).[9] Tr. 79. Hill concluded that Garcia could perform light work. Tr. 78. Garcia could frequently climb ramps, stairs, ladders, ropes, and scaffolds and balance and crawl. Tr. 78–79. She could occasionally stoop and crouch. Tr. 78–79.

### 4. *Hearing testimony*

Garcia, who was represented by counsel, testified at the video administrative hearing held in May 2021.[10] Tr. 36. When asked why she filed for disability, Garcia stated that she has a lot of pain in her back. Tr. 47. A doctor offered her back surgery but Garcia declined because she is scared to have surgery. Tr. 47–48.

---

[8] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. *See, e.g.*, 20 C.F.R. § 404.1615. Here, only a State Agency disability examiner reviewed Garcia's record and determined Garcia's RFC. Tr. 77–79.

[9] An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

[10] A Spanish language interpreter was also present. Tr. 37, 43.

Garcia stated that she always has pain in her back. Tr. 49. Her back becomes stiff and she has "a little pain" in her right leg. Tr. 49. Standing too long makes her back pain worse. Tr. 49. Sitting also causes back pain. Tr. 49. If she sits for more than an hour she needs to stand up and walk around for about 30 minutes to feel better. Tr. 50. She also has problems with her left shoulder. Tr. 50. She can't "stretch it out backwards completely" without feeling pain. Tr. 50. For example, she can't scratch her back. Tr. 50. She estimated that she could lift and carry less than 10 pounds using her left shoulder. Tr. 51.

Garcia described her lower back pain as "pressure," "pinchers," and sometimes a burning sensation. Tr. 52. When the pain "gets too much it goes to my right leg." Tr. 52. Back injections help with pain but the injections only last a month. Tr. 52.

When asked if she can read and understand English, Garcia answered, "a little." Tr. 62. She can read "some things" but doesn't understand much when someone talks. Tr. 62. At her prior job in an office, Garcia didn't have an interpreter but "there were a lot of Hispanic people in the office." Tr. 62. Garcia stated that her job required her to file papers and that those items were mostly written in English. Tr. 62–63.

The ALJ discussed with the vocational expert Garcia's past relevant work as a file clerk in a medical setting. Tr. 42–53. The ALJ asked the vocational expert to determine whether a hypothetical individual with the

10

same age, education, and work experience as Garcia could perform Garcia's past work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 53–54. The vocational expert answered that such an individual could perform Garcia's past work. Tr. 53–54.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2019.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2014 through her date last insured of June 30, 2019 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: moderate lumbar spondylosis and mild osteoarthritis of acromioclavicular joint (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following limitations. The claimant can frequently climb ladders, ropes, and scaffolds. The claimant can climb ramps and stairs. The claimant can frequently balance, kneel, and crawl. The claimant can occasionally stoop and crouch. She can frequently reach overhead bilaterally.

6. Through the date last insured, the claimant was capable of performing past relevant work as a File Clerk. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2014, the alleged onset date, through June 30, 2019, the date last insured (20 CFR 404.1520(f)).

Tr. 21–27.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.  Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.  Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.    Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

Garcia argues that the ALJ's finding that Garcia could perform her past relevant work is not supported by substantial evidence. Doc. 7, at 9. In support, Garcia spends almost 3 pages reciting a summary of her medical history. *Id*. at 9–12. She then concludes, "The ALJ was not fully persuaded by this evidence." *Id*. at 12. But Garcia doesn't allege an error that the ALJ made. Reciting medical evidence does not show that the ALJ's decision is not supported by substantial evidence. *See Jones*, 336 F.3d at 477 (even if substantial evidence supports a claimant's position, a court can't overturn the Commissioner's decision if substantial evidence supports the ALJ's conclusion).

Garcia argues that "[i]n addition, the ALJ erroneously failed to consider the testimony or written statements." Doc. 7, at 12. Garcia does not cite legal authority requiring an ALJ to discuss a claimant's testimony about her symptoms.[11] The ALJ discussed and evaluated Garcia's statements about symptoms that Garcia made to her providers and examiners in the record. Tr. 24–25. So the ALJ evaluated Garcia's reports of symptoms. *See, e.g.*, 20 C.F.R. § 404.1502(i) ("Symptoms means your own description of your physical or mental impairment."); *see* Soc. Sec. Ruling 16-3p, *Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304, at *2 (Oct. 25, 2017) ("We define a symptom as the individual's own description or statement of his or her physical or mental impairment[]").

The ALJ wrote that Garcia told Dr. Kropsky that she had back pain radiating to her legs and numbness in her right leg. Tr. 24. The ALJ commented that Garcia told Dr. Yevsikova that her pain was "constant every day" and rated it 10 out of 10. Tr. 24. Garcia reported reduced activities of daily

---

[11]    Garcia argues that the ALJ "failed to consider" the function report completed by Garcia's daughter on Garcia's behalf. Doc. 7, at 12. But "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Moreover, Garcia didn't include in the *Statement of Facts* section of her brief the allegations in the function report. So Garcia's reliance upon those allegations in the *Legal Analysis* portion of the brief is in violation of the Court's Initial Order. *See* Doc. 3, at 3–4 ("facts or evidence relied upon in [the Legal Analysis] section must have first been set forth in the Statement of Facts"). And Garcia's counsel has been previously warned about that practice. *See, e.g., Mencke v. Comm'r of Soc. Sec.*, Case No. 1:21-cv-2298, 2022 WL 2758577, at *1 n.2 (N.D. Ohio July 14, 2022).

living—she no longer cleaned, read, or attended church, and sometimes needed help showering and dressing. Tr. 24. The ALJ acknowledged that Garcia alleged pain and an inability to perform "the sitting, standing, and walking limitations required for light work" but found that her statements to Drs. Kropsky and Yevsikova—made 18 months apart—were inconsistent and there were no reported injuries or treatment changes to explain Garcia's alleged worsening condition. Tr. 25. The ALJ also remarked that Garcia had conservative treatment—daily non-narcotic pain relievers and a narcotic pain reliever for breakthrough pain—and that back injections helped relieve Garcia's pain. Tr. 25. Garcia does not dispute any of those findings.

Next, Garcia argues that the ALJ "failed to account for [Garcia's] disabling pain which would interfere with Garcia's ability to sustain work activity." Doc. 7, at 13. Garcia does not pinpoint what portion of the ALJ's decision she objects to. In her decision, the ALJ explained that Garcia's lumbar MRI findings showed moderate spondylosis. Tr. 24. The ALJ stated that Dr. Kropsky's objective exam findings showed that Garcia "had 5/5 strength in her extremities, hands and grip strength bilaterally," full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles, no tenderness or swelling in her joints, and normal sensation. Tr. 24. The ALJ remarked that, 18 months after that exam and despite Garcia's alleged worsening symptoms and reduced activity, Dr. Yevsikova found Garcia to have full strength in her grip, shoulders, and "lower extremity and hip." Tr. 24–25. Garcia had a normal

16

gait, no spinal tenderness or spasm, and a negative straight leg raise test. Tr. 24. Garcia had a normal cervical spine exam, good shoulder movement, and limited lumbar motion with "poor effort." Tr. 24. The ALJ explained that, during both exams, Garcia was "relatively independent." Tr. 25. The ALJ concluded that those objective exam findings undercut Garcia's allegations of disabling pain. Tr. 25. The ALJ also found that Garcia was diagnosed with mild joint osteoarthritis in her shoulder a year after her date last insured and received only conservative treatment for it. Tr. 25. Garcia doesn't challenge any of those findings. The ALJ's findings support the ALJ's reasoning and conclusion.

Garcia's argument that Garcia would be disabled if the ALJ had made a different RFC finding, Doc. 7, at 14, fails because Garcia doesn't show that the ALJ's RFC finding was erroneous. Garcia's assertion that "the ALJ failed to articulate any supportable rationale for her finding that Garcia's statements were not entirely consistent with the medical evidence," *Id.* at 16, is nonsensical because it ignores the ALJ's "support[ed] rationale" described above. In her reply brief, Garcia complains that the "ALJ stated that the MRIs resulted in a diagnosis of moderate spondylosis," Doc. 10, at 1, but agrees that Garcia's MRIs showed "moderate spondylosis." Tr. 24; Doc. 7, at 11, Tr. 595.

Garcia's hasn't shown that the ALJ erred, so the Commissioner's decision should be affirmed.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: January 27, 2023

                                                */s/ James E. Grimes Jr.*
                                                James E. Grimes Jr.
                                                U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).